# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEITH A. FOTTA, TELEMARK TECHNOLOGY, INC., GERALD A. CLARK, JAMES B. RICH, ILENE RICH, DIANE JURMAIN, and PETER JURMAIN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 8230-VCG |
| CHARLES D. MORGAN, individually and as Trustee of the CHARLES D. MORGAN REVOCABLE TRUST, and JEFFERSON D. STALNAKER, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FIRST ORION CORP., | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 16, 2015
Date Decided: February 29, 2016

Evan O. Williford and Andrew J. Huber, of THE WILLIFORD FIRM, LLC, Wilmington, DE; OF COUNSEL: Grant E. Fortson and Roger D. Rowe, of LAX, VAUGHAN, FORTSON, ROWE & THREET, P.A., Little Rock, AR, *Attorneys for the Plaintiffs*.

Andrew L. Cole, William A. Crawford, Daniel A. O'Brien, and Theodore J. Segletes, III, of FRANKLIN & PROKOPIK, Wilmington, DE; OF COUNSEL: Chad W. Pekron, of QUATTLEBAUM, GROOMS, TULL & BURROW PLLC, Little Rock, AR, *Attorneys for Defendants Charles D. Morgan, individually and as Trustee of the Charles D. Morgan Revocable Trust, and Jefferson D. Stalnaker*.

GLASSCOCK, Vice Chancellor

This matter involves what I perceive to have become a common scenario in this Court:[1] plaintiff stockholders allege that a significant creditor to the company has used its control over the corporate board together with contractual rights it has been granted to divert corporate wealth or equity to itself, in breach of fiduciary or statutory duties owed the common stockholders. Here, the Plaintiffs—stockholders in First Orion Corp.—contend that the Defendants used the method described above to inequitably seize from them control of the company, and seek a declaration rescinding the issuance of stock, together with damages and other relief. The matter is before me on cross motions for summary judgment. Because the issues so presented turn on contested issues of fact, those motions are largely denied. With respect to one claim brought derivatively, however, demand on the board was neither made nor excused, and I find that the Plaintiffs lack standing under Rule 23.1. My reasoning follows.

## I. BACKGROUND

*A. The Parties*

Nominal Defendant First Orion Corp. ("First Orion" or the "Company") is a privately held Delaware corporation,[2] which developed and sells Privacy Star, a mobile smartphone application that blocks unwanted calls and reports the caller to a

---

[1] Of course, my perception may merely reflect the Baader-Meinhof fallacy.
[2] Verified Second Amended Complaint ("Compl.") ¶¶ 9, 19.

1

regulatory body.[3]

Plaintiff Keith Fotta is the founder of First Orion.[4] Fotta owns approximately 98.3% of the outstanding stock of Plaintiff Telemark Technology, Inc. ("Telemark" and together with Fotta, the "Fotta Plaintiffs"), a Delaware Corporation.[5] The Fotta Plaintiffs are stockholders of First Orion. Plaintiffs Gerald Clark, James B. Rich, Illene Rich, Diane Jurmain, and Peter Jurmain (collectively, the "Individual Plaintiffs") are also common stockholders of First Orion.

Defendant Charles Morgan is the current Chairman of the Board of First Orion (the "Board") and is the Trustee of the Charles D. Morgan Revocable Trust, through which Morgan holds various interests in First Orion.[6] Defendant Jefferson D. Stalnaker was hired by First Orion in 2008 and has held multiple executive positions, including President and CEO, and was a director of the Company from January 27, 2010 through July 18, 2013.[7]

*B. Morgan's Initial Investment in First Orion*

Fotta founded First Orion in 2007 to develop and market technology for blocking unwanted callers and filing complaints against unwanted callers with the Federal Trade Commission.[8] All of the Plaintiffs have been stockholders of the

---

[3] *Id.* at ¶ 31.
[4] *Id.* at ¶ 19.
[5] *Id.* at ¶ 5.
[6] *Id.* at ¶ 10.
[7] *Id.* at ¶ 11.
[8] *Id.* at ¶ 19.

2

Company since 2007.[9]  In 2008, Morgan entered into a stock purchase agreement (the "SPA") with First Orion that allowed Morgan to invest in the Company's Series A Convertible Preferred Stock ("Preferred Stock").[10]  In addition, Morgan was appointed to the Company's Board.[11]  Each share of Preferred Stock was convertible into one share of common stock.[12]  By the end of September 2009, Morgan had invested $1,100,000 in exchange for 1,100,000 shares of Preferred Stock,[13] which at that time represented approximately 70% of the then-outstanding Preferred Stock of the Company.[14]

In October 2009, Fotta informed Morgan that the Company needed to raise additional capital to fund its operations.[15]  In response, Morgan agreed with Fotta and First Orion to advance the Company $500,000 (the "2009 Letter Agreement").[16] Pursuant to the 2009 Letter Agreement, the Fotta Plaintiffs agreed to provide Morgan irrevocable voting proxies (the "Proxies") for their common shares of stock in the Company.[17]  According to the 2009 Letter Agreement, the Proxies were to become effective in the event First Orion failed to repay the balance of the advanced

---

[9] *Id.* at ¶ 20.
[10] *Id.*, Ex. 4, at 1.
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.* at ¶ 24.
[15] Defs.' Br. in Supp. of Mot. to Dismiss the Second Am. Compl. and/or for Summ. J. ("Defs' Opening Br."), Ex. 17, at 71–72; Compl., Ex. 4, at 1–2.
[16] Compl., Ex. 1.
[17] *Id.*, Ex. 1, at 2.

funds by January 15, 2010.[18]  When effective, the Proxies granted Morgan the right to "exercise all of the Grantor's rights as a shareholder of [First Orion]," and were to remain effective until the Company experienced a "net positive cash flow" for three consecutive quarters.[19]  At the time of the 2009 Letter Agreement, Fotta owned 3,880,597 shares of common stock and 100 shares of Preferred Stock, and Telemark owned 2,940,122 shares of common stock.[20]  Together, the Fotta Plaintiffs' stock ownership represented 72.8% of the outstanding capital stock.  Conversely, the Individual Plaintiffs owned approximately 2.86% of the outstanding capital stock, collectively.[21]

The 2009 Letter Agreement also provided Morgan other valuable incentives. For each dollar Morgan advanced the Company pursuant to the 2009 Letter Agreement, Morgan was to receive a specified number of warrants to purchase common shares of First Orion for $1.50 per share.[22]  In addition, if the Company failed to repay the advance in full by January 15, 2010, Morgan would receive one Preferred Share for each dollar advanced.  Between October 15, 2009 and January 15, 2010, Morgan advanced $400,000 to the Company pursuant to the 2009 Letter Agreement.[23]  Accordingly, Morgan received 1,500,000 warrants to purchase shares

---

[18] *Id.*
[19] *Id.* at Attachments 2, 3.
[20] *Id.* at ¶ 30.
[21] *Id.*
[22] *Id.*, Ex. 1, at 2; Defs' Opening Br., Ex. 2E, at 1.
[23] Compl., Ex. 4, at 2.

of common stock for $1.50 per share (the "Morgan Warrants").[24]

First Orion failed to repay the advanced funds by January 15, 2010.[25] Consequently, the Proxies became effective immediately, and First Orion was forced to issue Morgan 400,000 additional shares of Preferred Stock in satisfaction of the 2009 Letter Agreement.[26] According to the Plaintiffs, through the "combination of his stock ownership, his possession of the Proxies, and his position as one of the Company's two Directors, Morgan was on and after January 15, 2010 the sole controlling stockholder of First Orion."[27]

*C. Morgan Solidifies his Control of First Orion*

On January 27, 2010, Morgan, acting via written consent, voted his shares and the newly-obtained Proxies to remove Fotta as a director and officer of the Company, and to select Stalnaker to succeed Fotta as director and CEO.[28] Weeks later, on February 16, 2010, Morgan and Stalnaker, as sole directors of First Orion, declared a dividend (the "2010 Stock Dividend") whereby holders of Preferred Stock would receive 73.9901 shares of common stock for each share of Preferred Stock.[29] On that same day, in order to facilitate the 2010 Stock Dividend, Morgan, again acting via written consent, voted his shares and the Proxies to authorize an amendment to

---

[24] Defs' Opening Br., Ex. 2E.
[25] Compl. ¶ 32.
[26] *Id.*
[27] *Id.* at ¶ 34.
[28] Defs' Opening Br., Ex. 2B, at 3020.
[29] Compl., Ex. 4.

the Company's Certificate of Incorporation to increase the number of authorized shares of common stock from 25,000,000 to 275,000,000 shares and to increase the number of shares of authorized Preferred Stock to 100,000,000 shares.[30]

Immediately prior to the 2010 Stock Dividend, Morgan held 1,500,000 shares of Preferred Stock, representing approximately 76% of the Preferred Stock then-outstanding.[31] A total of 145,541,519 common shares were issued in the 2010 Stock Dividend.[32] As a result, Morgan's "total ownership" interest increased from approximately 15% to 72% and the Plaintiffs' collective "ownership interest" decreased from approximately 72.5% to 4.5%.[33] In addition, Morgan's Warrants—which originally provided Morgan the right to purchase 1,500,000 shares of common stock for $1.50 per share—were adjusted, in accordance with their terms,[34] to give Morgan the right to purchase 110,985,175 shares of common stock for $.02030 per share.[35] The Plaintiffs characterize this adjustment as an issuance of additional warrants (the "Additional Warrants").

On February 19, 2010, three days after the 2010 Stock Dividend was declared, Stalnaker sent the Company's stockholders, including the Plaintiffs, a letter (the

---

[30] *Id.*, Ex. 5. Stalnaker filed with the Delaware Secretary of State a Certificate of Amendment to the Certificate of Incorporation reflecting the increase in authorized shares of stock. *Id.*, Ex. 6.
[31] *Id.* ¶ 51.
[32] Pls.' Opening Br. in Supp. of Mot. for Partial Summ. J. and Answering Br. in Opp. to Defs.' Mot. to Dismiss and/or for Summ. J. ("Pls' Answering Br."), Ex. 10, at ¶ 7.
[33] Compl. ¶ 55.
[34] Defs' Opening Br., Ex. 2E, at 3–5.
[35] Compl. ¶ 68; Pls' Opening Br., Ex. 1.

"Stalnaker Letter") that enclosed (1) the Written Consent of the Shareholders, dated January 27, 2010, to remove Fotta as officer and director of the Company and elect Stalnaker in his place; (2) the Written Consent of the Board, dated February 16, 2010, to authorize the 2010 Stock Dividend; and (3) the Written Consent of the Shareholders, also dated February 16, 2010, to approve an amendment to the Company's Certificate of Incorporation to increase the number of authorized shares of capital stock and to approve the 2010 Stock Dividend.[36]

*D. Morgan Leads Subsequent Funding of First Orion*

In the years following the 2010 Stock Dividend, the Company completed four rounds of equity financing through the private placement of Series B Convertible Preferred Stock: (1) the Company raised approximately $600,000 shortly after the 2010 Stock Dividend;[37] (2) the Company raised $4,000,000 starting October 2010;[38] (3) the Company extended the second issuance to raise an additional $2,000,000 starting September 2011;[39] and (4) the Company raised more than $3,500,000 starting in July 2012.[40] The majority of each investment was provided by Morgan and a small group of other individual investors, most of whom had prior relationships

---

[36] Defs' Opening Br., Ex. 2B; *id.*, Ex. 2C.
[37] *Id.*, Ex. 2, at ¶ 14; *id.*, Ex. 2H.
[38] *Id.*, Ex. 2P.
[39] *Id.*, Ex. 2R.
[40] *Id.*, Ex. 2S.

with Stalnaker.[41]  In addition to equity financing, the Company entered into a line of credit agreement with Arvest Bank for $250,000, which was personally guaranteed by Morgan and Stalnaker.[42]

For each round of funding, the Company sent Fotta a private placement memorandum providing details of the offering.  Furthermore, for at least the first and second rounds of funding, the Company sent Fotta a "Preemptive Rights Notice" pursuant to the "Preemptive Rights Agreement," dated August 4, 2008, which entitled certain investors "preemptive rights upon the issuance of certain securities by First Orion."[43]  In addition to receiving the formal notices sent by the Company, Fotta periodically communicated with the Company, at times via email, to request additional financial information and to obtain the status of the Company's offerings.[44]  Notably, Fotta did not object to the 2010 Stock Dividend or the 2010 Amendment to the Certificate of Incorporation before or during the rounds of financing culminating in 2012.

---

[41] Stalnaker avers that the large majority of financing was provided by Morgan, Rodger Kline, Jerry Adams, James Womble, and Kenneth Lee, most of whom Stalnaker has known for many years through other business ventures.  *See id.*, Ex. 2, at ¶ 14.  Nearly 90% of the first round of funding and nearly 75% of the second and third round of funding was provided by that group of investors.  *Id.* at ¶ 14, 22.  Further, of the $3,500,000 raised in the fourth round of financing, over 80% was provided by the same group of investors, with the addition of Kent Burnett.  *Id.* at ¶ 23. I note that, with the exception of Morgan, none of these investors are parties to the action.

[42] The Company's line of credit is described in the Company's private placement memorandum dated October 29, 2010.  *Id.*, Ex. 2P, at 3557.

[43] *Id.*, Ex. 2B; *id.*, Ex. 2N.

[44] *Id.*, Ex. 2J; *id.*, Ex. 2K; *id.*, Ex. 2L; *id.*, Ex. 2M; *id.*, Ex. 2Q.

*E. Stalnaker is Granted Stock Options*

When Stalnaker was first hired as President of First Orion in 2008, he believed that the Company was going to grant him stock options that represented between 3.5% and 5% of the Company's outstanding shares.[45] The Company failed to grant Stalnaker stock options when he started, however. Years later, on September 30, 2011, the First Orion Board, which then consisted of Stalnaker and Morgan, adopted the 2011 Nonqualified Stock Option Plan (the "2011 Stock Option Plan") that authorized the Board to issue stock options to its members.[46] On that same day, Morgan, in his capacity as majority stockholder, voted to approve the 2011 Stock Option Plan.[47] With the 2011 Stock Option Plan in place, the Company granted two series of stock options to Stalnaker (together, the "Stalnaker Options"). The first, which the Company granted to Stalnaker on the day the 2011 Stock Option Plan was approved, provided Stalnaker the right to purchase 19,797,879 shares of common stock for $0.01553 per share.[48] The second stock option grant, dated November 28, 2011, gave Stalnaker the right to purchase an additional 37,488,121 shares of

---

[45] Stalnaker avers that Fotta presented to him an offer letter containing the terms of the contemplated stock options but that Fotta failed to execute the offer. *Id.*, Ex. 18, at 292–94; *see also id.*, Ex. 26.

[46] Compl., Ex. 9. According to the Written Consent of the Board of September 30, 2011, the Company reserved 20% of its common stock for stock issued pursuant to the 2011 Stock Option Plan. *Id.*

[47] Defs' Opening Br., Ex. 31.

[48] Compl., Ex. 9.

9

common stock for $0.0203 per share.[49]  In total, the Stalnaker Options represent between 8% and 8.5% of the ownership of the Company.[50]

On December 11, 2014—nearly three years after the Stalnaker Options were granted and two days after the Plaintiffs filed their Second Amended Complaint—First Orion directors James Womble and Kent Burnett, who are not parties to this action, purported to ratify the Stalnaker Options.[51]

### F. Procedural History and Contentions of the Parties

The Fotta Plaintiffs filed a Verified Complaint on January 17, 2013 (the "Original Complaint") and a First Amended Complaint on May 23, 2013, which added the Individual Plaintiffs.  The Plaintiffs filed a Second Amended Complaint on December 9, 2014, in which they allege seven derivative claims on behalf of Nominal Defendant First Orion, four direct claims on behalf of all of the Plaintiffs, and three direct claims on behalf of the Fotta Plaintiffs.  In general, the Plaintiffs challenge the 2010 Stock Dividend, the Additional Warrants, and the Stalnaker Options by asserting "claims for breach of fiduciary duty, gift and waste against Morgan and Stalnaker, for conversion and unjust enrichment against Morgan, for aiding and abetting against Stalnaker, and for a declaratory judgment that the stock

---

[49] *Id.* at ¶ 97; Defs' Opening Br., Ex. 18, at 303–09.
[50] Compl. ¶ 97; Defs' Opening Br., Ex. 18, at 303–09.
[51] Defs' Opening Br., Ex. 27.

issued as the dividend is void *ab initio*."[52]  The Fotta Plaintiffs also "assert[] claims against Morgan for breach of fiduciary duty and of the implied covenant of good faith and fair dealing."[53]

The Defendants filed a Motion to Dismiss the Second Amended Complaint and/or for Summary Judgment on January 23, 2015.  Pursuant to their motion, the Defendants argue that the Plaintiffs' claims regarding the 2010 Stock Dividend are barred by the doctrine of acquiescence; that the Plaintiffs' equitable claims are time-barred by the doctrine of laches; and that the Plaintiffs' claims regarding the Stalnaker Options must fail because the Plaintiffs failed to make a demand on the First Orion Board and because the Stalnaker Options were ratified by a disinterred majority of the Board.

In addition to opposing the Defendants' motion, the Plaintiffs filed a Motion for Partial Summary Judgment on March 13, 2015.  The Plaintiffs assert that the stock issued in the 2010 Stock Dividend is void as a matter of law because it was issued in violation of the Delaware General Corporation Law ("DGCL").  Furthermore, the Plaintiffs argue that the Defendants cannot avoid a finding that this stock is void despite the Defendants' assertion of the defenses of acquiescence and laches.

---

[52] Compl. ¶ 3.
[53] *Id.*

## II. STANDARD OF REVIEW

All of the motions, except for the Defendants' motion regarding the Plaintiffs' failure to make a demand, rely upon matters that are outside the pleadings, and therefore are analyzed pursuant to Court of Chancery Rule 56. In accordance with Rule 56, a party is entitled to summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[54]

I treat the portion of the Defendants' motion challenging the Plaintiffs' failure to make a demand as a motion to dismiss pursuant to Rule 23.1. Generally, if a stockholder wishes to initiate an action on behalf of the corporation, she must make a demand on the board to assert the rights of the corporation or explain why such a demand would be futile.[55] If the stockholder wishes to pursue an action on behalf of the corporation, Rule 23.1 requires that the plaintiff stockholder "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[56] The standard articulated in Rule 23.1 "imposes a more arduous pleading standard than Rule 8(a), and a plaintiff must allege sufficient particularized facts showing that demand on the board

---

[54] Ct. Ch. R. 56(c).
[55] *See Seinfeld v. Sager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012).
[56] Ct. Ch. R. 23.1.

12

would have been futile."[57]

## III. ANALYSIS

I address the parties' motions separately below and find that both motions are denied, with one exception: I grant the portion of the Defendants' motion seeking dismissal for failure to comply with Rule 23.1 for the claims challenging the Stalnaker Options.

### A. *The Plaintiffs' Motion for Summary Judgment*

The Plaintiffs moved for summary judgment with respect to their claims that the common stock issued pursuant to the 2010 Stock Dividend and the related Additional Warrants are void as in violation of the DGCL. Specifically, the Plaintiffs refer to their allegations in Counts I, V, and VI of their Second Amended Complaint. These counts raise both equitable and statutory claims; the Plaintiffs' motion is addressed only to the statutory claims and, in the alternative, claims of waste. Notwithstanding the resolution of the Plaintiffs' motion, the equitable claims for breach of duty will remain for trial. The Plaintiffs also note that they move for summary judgment on only the liability portion of their claims and do not request that the Court fashion a remedy at this stage in the litigation. Essentially, the Plaintiffs in this motion seek a declaration that the 2010 Stock Dividend did not comply with the DGCL.

---

[57] *Seinfeld*, 2012 WL 2501105, at *2 (citations omitted).

In Counts I and V, the Plaintiffs allege that the 2010 Stock Dividend and issuance of the Additional Warrants amount to waste of corporate assets. In Count I, which is asserted as a derivative claim against Morgan and Stalnaker for breaches of fiduciary duty, the Plaintiffs allege that "First Orion received no consideration of any kind in exchange for the issuance of the dividend shares of common stock," and that "the issuance of [the] Additional Warrants was not approved by Board action nor by a vote of the shareholders." In sum, in Count I the Plaintiffs allege that "[t]he 2010 Stock Dividend and the issuance of the Additional Warrants were self-dealing, bad faith transactions which benefited Morgan personally and amounted to a gift or waste of corporate assets." In Count V, which is asserted as a derivative claim against Morgan for violation of various provisions of the DGCL,[58] the Plaintiffs allege that "shares of common stock issued by the Company . . . [were] issued to Morgan and the other preferred shareholders for no consideration"—in violation of Section 153—and that the "Defendants granted Morgan the Additional Warrants . . . without any action by the Board to approve the issuance . . . and for no consideration," in violation of Sections 152 and 153. In their opening brief, the Plaintiffs clarified that Counts I and V are relevant to this motion only to the extent

---

[58] Specifically, the Plaintiffs allege that "8 Del. C. §§ 151, 152, 153, 157, 161 and 166 govern the issuance of stock in First Orion, and require Board approval of the issuance of stock, including of any transaction that binds the corporation to issue stock in the future." Compl. ¶ 133. Additionally, the Plaintiffs allege that "8 Del. C. § 153 provides that stock with par value may be issued for consideration having a value *not less than* the par value thereof." *Id.* at ¶ 134 (emphasis in the original).

the 2010 Stock Dividend is "characterized as an issuance of stock pursuant to a recapitalization rather than a dividend."[59] Although the 2010 Stock Dividend has been characterized as a recapitalization at times in this litigation,[60] both parties have represented in their briefs and at oral argument that the 2010 Stock Dividend was a dividend transaction. For the purposes of this Memorandum Opinion, I will treat the 2010 Stock Dividend as a dividend transaction and, therefore, I do not address Plaintiffs' Motion for Summary Judgment as it pertains to Counts I and V.

That leaves Plaintiffs' allegations in Count VI that the 2010 Stock Dividend violated Sections 170 and 173 of the DGCL and that, therefore, the common stock issued therein is void.[61] I address each section of the DGCL and find that issues of material fact exist such that summary judgment is inappropriate.

The Plaintiffs allege that the 2010 Stock Dividend is void because the Company did not have sufficient capital surplus nor net profits in accordance with Section 170 of the DGCL. Section 170 states, in part, the following:

> (a) The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay

---

[59] The Plaintiffs argue that "[i]f characterized as an issuance of stock pursuant to a recapitalization rather than a dividend, the Dividend Stock is nevertheless void because the issuance of stock in exchange for no consideration violates section 153 of the DGCL and constitutes waste." Pls' Opening Br. 21.

[60] The Plaintiffs point to deposition testimony in which Morgan and Stalnaker refer to the 2010 Stock Divided as a "recapitalization." *Id.* at 21 n.7.

[61] In the alternative, the Plaintiffs seek damages pursuant to 8 *Del. C.* § 174. I do not address Section 174 here since the Plaintiffs' Motion for Summary Judgment is limited to the issue of liability only, nor do I address whether a finding that stock was issued as a dividend in violation of statute should result in a determination that the stock so issued is void.

15

dividends upon the shares of its capital stock either:

> (1) Out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title; or

> (2) In case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.[62]

As a threshold matter, the Defendants contend that Section 170, based on their understanding of the purpose of the statue, does not apply to dividends paid in stock. The actions of the General Assembly indicate, however, that it did intend Section 170 to apply to stock dividends.[63] Therefore, for the purposes of the Plaintiffs' Motion for Summary Judgment, I assume that Section 170 applies here.

The Plaintiffs assert that the 2010 Stock Dividend violated Section 170 because, at the time of the dividend, the Company's balance sheet indicated a deficient surplus.[64] By that measure, the surplus was indeed inadequate to absorb

---

[62] 8 *Del. C.* § 170(a)(1)–(2).

[63] *Folk on the General Corporation Law* explains that the General Assembly amended Section 173 in 1985 and, in doing so, indicated that the restrictions provided in Section 170 pertain to stock dividends:

> The 1985 amendment replaced references to transfers from surplus to the capital account in respect of dividend shares with references to designation as capital of the par or stated value of such shares. The amendment was designed to make clear that stock dividends may be distributed by a corporation even when it has no surplus, so long as it has net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal years, as provided by Section 170.

Edward P. Welch et al., Folk on the Delaware General Corporation Law § 173.02 (6th ed. 2015) (citing S. 116, 133d Gen. Assembly 4–5, 65 Del. Laws, c. 127, § 5 (1985)).

[64] According to the Plaintiffs, First Orion's balance sheet revealed a surplus of approximately $83,000, which is less than the aggregate par value of the common stock issued in the 2010 Stock Dividend of over $1.4 million.

the dividend declared. However, when calculating a corporation's surplus in accordance with Section 154, as instructed by Section 170, the directors are not constrained by the balances of assets and liabilities as stated on the balance sheet. Instead, a corporation may revalue its assets and liabilities to reflect market conditions.[65] Since the Plaintiffs solely rely on First Orion's balance sheet as an indication of surplus, and since the record does not adequately reflect the Company's revalued net surplus, I find that material issues of fact remain, and cannot determine as a matter of law that the 2010 Stock Dividend violated Section 170.

The Plaintiffs also contend that the 2010 Stock Dividend is illegal because the Board failed to cause the Company to designate the issued stock as capital in accordance with Section 173 of the DGCL. Section 173 states, in part, the following:

> If the dividend is to be paid in shares of the corporation's theretofore unissued capital stock the board of directors shall, by resolution, direct that there be designated as capital in respect of such shares an amount which is not less than the aggregate par value of par value shares being declared as a dividend and, in the case of shares without par value being declared as a dividend, such amount as shall be determined by the board of directors.[66]

The Plaintiffs argue that the Company failed to designate as capital the aggregate par value of the common shares issued in the 2010 Stock Dividend and, therefore,

---

[65] *See e.g.*, *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 154 (Del. 1997) ("Allowing corporations to revalue assets and liabilities to reflect current realities complies with the statue and serves well the policies behind the statute.").
[66] 8 *Del. C.* § 173.

the issued shares are void. I note that in the board resolution declaring the dividend, the Board indicated that it complied with Section 173.[67] However, financial statements produced after the 2010 Stock Dividend reveal an inconsistent accounting of the dividend and, therefore, it remains an issue of fact whether or when the Company designated as capital the aggregate par value of the common stock issued.

Finally, the Plaintiffs argue that the adjustment to the Morgan Warrants triggered by the 2010 Stock Dividend—referred to as the "Additional Warrants"—must be void because the 2010 Stock Dividend is void. I have already determined that issues of material fact remain and that I cannot conclude that the 2010 Stock Dividend is void as a matter of law. Likewise, I am unable to conclude that the Additional Warrants are void.

Based on my findings above, I conclude that issues of material facts exist and that the Plaintiffs are not entitled to judgment as a matter of law. Therefore, the Plaintiffs' Motion for Partial Summary Judgment is denied.

*B. The Defendants' Motion to Dismiss and/or for Summary Judgment*

The Defendants moved for summary judgment on two theories. First, the Defendants argue that all of the Plaintiffs' claims regarding the 2010 Stock Dividend

---

[67] In an action by unanimous written consent on February 16, 2010, the Board adopted a resolution that stated that, "in accordance with Section 173 of the Delaware General Corporation Law, there is designated as capital of the Company an amount which is not less than the aggregate par value of the shares being issued as a dividend by the Company." Defs' Opening Br., Ex. 2B, at 3025.

18

are barred by the doctrine of acquiescence. Second, the Defendants assert that the Plaintiffs' equitable claims are barred by laches. I find that the resolution of these arguments requires further factual development and deny that portion of the Defendants' motion. Finally, the Defendants argue that the Plaintiffs' claims that challenge the Stalnaker Options—raised for the first time in the Second Amended Complaint—should be dismissed pursuant to Rule 23.1 for failure to make a demand on the Board. I find that the Plaintiffs failed to sufficiently plead demand futility as to those claims. Therefore, I grant the Defendants' motion to the extent it seeks dismissal of the Plaintiffs' claims challenging the Stalnaker Options.

### 1. Acquiescence

According to the Defendants, the Plaintiffs learned of the 2010 Stock Dividend on February 19, 2010 and remained silent for nearly three years, thereby acquiescing to the 2010 Stock Dividend. The Plaintiffs' acquiescence, the Defendants argue, now bars their legal and equitable claims. At the outset, I note that the doctrine of acquiescence has not been applied in a consistent manner.[68]

---

[68] *See Lehman Bros. Holdings Inc. v. Spanish Broad. Sys.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014). In *Lehman Brothers*, the Court identified three separate species of acquiescence. In the first, which is inapplicable here, a stockholder is said to have acquiesced to a merger and cannot challenge the transaction if the stockholder accepted the merger consideration. *Id.* at *9 n.54. Second, the doctrine of acquiescence has been used to estop a claimant from seeking equitable relief where the claimant has unreasonably delayed in silence, thereby prejudicing the defendant. *Id.* (citing 3 Pomeroy's Equity Jurisprudence § 817 (5th ed. 1941)). In *Klaassen v. Allegro Def. Corp.*, 106 A.3d 1035, 147 (Del. 2014), the Delaware Supreme Court explicitly noted that, in order to show acquiescence in Delaware, a defendant is not required to allege that it suffered prejudice as the result of the plaintiff's delay. Finally, the doctrine of acquiescence has been applied, as it

However, this Court has noted that "inaction or silence on the part of a plaintiff, in certain circumstances, can bar a plaintiff from relief both equitable and legal."[69] The Delaware Supreme Court has established a clear test which states that the doctrine of acquiescence applies where a claimant

> has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[70]

In order to show that a claimant acquiesced, a defendant need not prove a "conscious intent to approve the act,"[71] nor a "change of position or resulting prejudice."[72] Unlike the doctrine of laches, which is addressed below, acquiescence centers on the "*[d]efendant* and *its* understanding that complained-of acts were acquiesced in."[73] In sum, the doctrine of acquiescence focuses on "why the plaintiff must be adjudged complicit in the very breach for which she seeks damages."[74]

In this case, the Defendants argue that the Individual Plaintiffs were fully

---

was in *Lehman Brothers*, as an "estoppel by silence" or "inaction," where a claimant, with full knowledge of the facts, stands by while the defendant commits the alleged wrongdoing. *See* 2014 WL 718430, at \*9 n.56.

[69] *Lehman Bros.*, 2014 WL 718430, at \*9 (citations omitted).

[70] *Klaassen*, 106 A.3d at 1047 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998)).

[71] *Id.* (*citing Frank v. Wilson & Co.*, 9 A.2d 82, 87 (Del. Ch. 1939), *aff'd*, 32 A.2d 277 (Del. 1943)).

[72] *Id.* (citations omitted).

[73] *Brevan Howard Credit Catalyst Master Fund Ltd. V. Spanish Broad. Sys., Inc.*, 2015 WL 2400712, at \*2 (Del. Ch. May 19, 2015) (emphasis in the original).

[74] *Id.*

informed of the 2010 Stock Dividend by the Stalnaker Letter of February 19, 2010, only three days after the dividend was declared, and that the Plaintiffs remained silent until the filing of this action, evidencing that they had acquiesced in the transaction. The Defendants note that one of the Individual Plaintiffs, Ms. Jurmain, contacted the Company in 2012, but did not express an objection to the 2010 Stock Dividend. The Defendants argue that the Fotta Plaintiffs were similarly fully informed by the Stalnaker Letter and that, in addition, they received private placement memorandums, sent in conjunction with the Company's subsequent financing efforts, which again disclosed the critical facts surrounding the 2010 Stock Dividend. In addition to the Fotta Plaintiffs' silence regarding the 2010 Stock Dividend, the Defendants point to periodic communications between Fotta and Stalnaker in which Fotta acknowledges Stalnaker and Morgan as controlling First Orion and makes comments on the Company's successes. According to the Defendants, the Fotta Plaintiffs' silence regarding the 2010 Stock Dividend amongst ongoing communication is evidence of their acquiescence.

The Defendants argue that *Lehman Brothers Holdings, Inc. v. Spanish Broadcasting Systems, Inc.*[75] and *Klaassen v. Allegro Development Corp.*,[76] in which the Court found that the claimants had acquiesced, support their theory. I find,

---

[75] 2014 WL 718430 (Del. Ch. Feb. 25, 2014).
[76] 106 A.3d 1035 (Del. 2014).

21

however, that the factual circumstances in this case are dissimilar to the cases relied on by the Defendants.

In *Lehman Brothers*, the plaintiffs held preferred stock that entitled holders to accrued dividends quarterly. If the dividends were not paid for four consecutive quarters, the preferred stockholders were entitled to certain rights, including the right to fill seats on the board and to constrain the company from acquiring certain additional debt. Eventually, the company failed to pay dividends to preferred stockholders for four consecutive quarters, thereby triggering those additional rights. The plaintiffs did not immediately assert their rights to designate a board member, however, and later, when the company's board publicly announced its intention to acquire debt, the plaintiffs again remained silent. Almost three years after the preferred stockholders' rights were triggered, and one year after the latest debt incurrence, the plaintiffs filed suit challenging the debt transactions. The Court found that the plaintiffs were estopped under the doctrine of acquiescence because they knowingly stood by, witnessed a breach, and permitted the accrual of damages that could have been prevented had the plaintiffs not stood silent.[77]

In *Klaassen*, the defendant directors intended to fire the plaintiff CEO and director at the next regularly scheduled board meeting. During the meeting, the defendant directors initiated an executive session, for which the CEO was asked to

---

[77] *Lehman Bros.*, 2014 WL718430, at *12.

leave the room. During the executive session, the defendant directors agreed to terminate the CEO's employment. Upon the CEO's return to the board meeting, the board voted to terminate his employment. The CEO failed to challenge his termination at the meeting, however. About seven months after his termination—during which time the then-former CEO initially offered to help train the new CEO and also began negotiating a consulting agreement with the company—the former CEO filed suit alleging that his removal was invalid.

Based on the circumstances in both *Lehman Brothers* and *Klaassen*, the plaintiff had the ability to challenge the breach *at the time of* the alleged wrongdoing, or as damages were incurred thereby, such that the plaintiff was adjudged complicit in the very breach for which it sought relief.[78] Here, however, the Defendants have made no assertions regarding their own view of the Plaintiffs' knowledge of the 2010 Stock Dividend and their inaction *at the time it was declared*. Nor have the Defendants sufficiently explained how the Plaintiffs' inaction led them to believe the 2010 Stock Dividend had been approved. Instead, the Defendants largely focus on the *Plaintiffs' knowledge* after the alleged wrongdoing and have merely asserted

---

[78] *See id.* at *9. In *Espinoza v. Zuckerberg*, this Court noted that it appeared that the standard articulated in *Klaassen* could be applied to the claimant's action after the fact and, therefore, implicated conduct that had been traditionally characterized as ratification. 124 A.3d 47, 60 n.68 (Del. Ch. 2015) (referring to the form of "ratification" explained in *Frank*, 32 A.2d 277). I note, however, that *Klaassen* involved the type of facts typically present where estoppel by acquiescence is involved. Although *Klaassen* referenced behavior occurring after the alleged breach, the case involved an actor who was present and able to acquiesce from the time of the alleged wrongdoing.

23

that they were aware of the Plaintiffs' inaction. Although Fotta affirmatively acted in a way that could potentially give rise to estoppel by acquiescence—including standing mute while Morgan and third parties participated in the several financing rounds after the 2010 Stock Dividend—a more developed record would be helpful to assess the Defendants' understanding of the Fotta Plaintiffs' actions. There remain questions of fact, the resolution of which is required to determine if the Plaintiffs may be adjudged complicit in the 2010 Stock Dividend. The Defendants' Motion for Summary Judgment based on acquiescence is, accordingly, denied.

Before turning to the defense of laches, I note that many of the facts and circumstances discussed in the laches analysis overlap with those discussed in the acquiescence analysis above.[79] This reverberation is an artifact of what appears to me a misapplication of the acquiescence doctrine: where the claimants are informed of the alleged wrong *after* its completion and thereafter fail to take action for an extended period. That set of circumstances, to me, implicates a ratification or laches defense, the latter of which I discuss below.

### 2. Laches

The Defendants allege that laches bars the Plaintiffs' request for equitable relief because the Plaintiffs unreasonably delayed in bringing a claim. The equitable

---

[79] The Defendants concede the similarities in their opening brief: "The facts and analysis set forth in the preceding section demonstrate the defense of laches as readily as they demonstrate the defense of acquiescence." Defs' Opening Br. 45.

24

doctrine of laches is rooted in the maxim that "equity aids the vigilant, not those who slumber on their rights."[80] Fundamentally, laches protects a defendant when a plaintiff has unreasonably delayed in seeking relief and the defendant thereby suffers prejudice. Generally, in order to establish a laches defense, a defendant must show: (1) that the plaintiff had knowledge of a legal claim; (2) that the plaintiff unreasonably delayed in bringing the claim; and (3) that the defendant has suffered a resulting prejudice.[81]

a. The Plaintiffs' Knowledge of an Equitable Claim

The Defendants assert that the Plaintiffs first attained knowledge of their equitable claims upon receipt of the Stalnaker Letter on February 19, 2010, which purports to inform the Plaintiffs of the 2010 Stock Dividend. According to the Defendants, upon receipt of that letter, the Plaintiffs were given actual notice of the self-dealing nature of the 2010 Stock Dividend and inquiry notice as to any other claims that may arise from the 2010 Stock Dividend. The Plaintiffs, however, assert that the Stalnaker Letter did not provide the Plaintiffs adequate knowledge to pursue their claims because its contents misrepresented the nature of the transaction,[82] and because it omitted facts material to their claims.[83] I disagree.

---

[80] *Whittington v. Dragon Grp., LLC*, 991 A.2d 1, 8 (Del. 2009) (citing *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

[81] *See, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009).

[82] Pls' Opening Br. 47.

[83] The Plaintiffs list eight omitted facts that they assert were omitted: (1) "The current list of shareholders in First Orion"; (2) "The number of common and preferred shares owned by each

25

On the face of the letter, Stalnaker, as President and CEO of the Company, stated the following:

> As a shareholder of First Orion Corp. I have enclosed copies of the following:
> 1. Written Consent of the shareholders of First Orion dated January 27, 2010.
> 2. Unanimous Written Consent of the Board of Directors of First Orion dated February 16, 2010.
> 3. Written Consent of the shareholders of First Orion dated February 16, 2010. [84]

Accordingly, each stockholder received copies of the three documents listed above.

The Written Consent of the Shareholders dated January 27, 2010, was an action by Morgan, acting as a stockholder and pursuant to the proxies received from Fotta, to remove Fotta as officer and director and to install Stalnaker in his place. [85]

The Written Consent of the Board of Directors dated February 16, 2010, was an action by Morgan and Stalnaker, as sole directors of the Company, to declare the 2010 Stock Dividend and to propose an amendment to the Certificate of Incorporation to increase the number of authorized shares needed to complete the dividend. [86] Included in the preamble is a chronological summary of First Orion that

---

shareholder"; (3) "The total number of shares of Dividend Stock being issued"; (4) "The percentage of the Dividend Stock that was given to Charles Morgan"; (5) "The percentage of outstanding shares of First Orion that Charles Morgan would own after the issuance of the Dividend Stock"; (6) "The percentage of outstanding shares of First Orion that the common shareholders would own after the issuance of the Dividend Stock"; (7) "The balance of First Orion's surplus"; and (8) "The balance of First Orion's capital accounts." Pls' Opening Br. 33–34.

[84] Defs' Opening Br., Ex. 2C.

[85] *Id.*, Ex. 2B, at 3020.

[86] *Id.* at 3021–25.

states the initial capital structure of the Company; describes Morgan's investment in the Company's Preferred Stock; and provides details of the 2009 Letter Agreement between Morgan and the Company that resulted in the transfer of majority voting control to Morgan.[87] Furthermore, in the preamble the directors expressed the Company's desperate need of additional capital; it noted the Company's intention to raise $600,000 in the near future; and it listed the objectives necessary to attract potential investors.[88] Finally, the directors endorsed the 2010 Stock Dividend as in the best interest of the Company:

> In order to accomplish these objectives, the Board has determined that it is in the best interest of the Company and its common and preferred shareholders to issue a Common Stock dividend to current holders of Preferred Stock which will result in a restructuring of the capital and stock ownership of the Company to reflect stock ownership among the common and preferred stockholders in proportion to each shareholder's total cash contribution to the Company since its inception, . . .[89]

Following the preamble, the Board resolved and recommended to stockholders that the Company adopt the 2010 Stock Dividend, which entitled preferred stockholders to 73.9901 shares of common stock for each share of Preferred Stock.[90]

The third and final enclosure was the Written Consent of the Shareholders dated February 16, 2010. Morgan, again acting as a stockholder and pursuant to the

---

[87] *Id.* at 3021–23.
[88] *Id.* at 3024.
[89] *Id.*
[90] *Id.* at 3025.

Proxies received from the Fotta Plaintiffs, approved the recommendations of the Board to amend the Certificate of Incorporation and declare the 2010 Stock Dividend.[91]

In addition to the three enclosures described above, Fotta, as a party to the "Preemptive Rights Agreement of First Orion Corp.," received a Preemptive Rights Notice with the Stalnaker Letter on February 19, 2010. The Preemptive Rights Notice notified Fotta that the Company planned to offer newly authorized Series B Convertible Preferred Stock, which stock Fotta had a preemptive right to purchase.[92] Attached to the Preemptive Rights Notice was a Term Sheet providing details of the upcoming offering.[93]

Upon reading the documents enclosed with the Stalnaker Letter, I find that the Plaintiff stockholders had sufficient information to bring a claim challenging the 2010 Stock Dividend. The Written Consent of the Board of Directors of February 16, 2010, described the events leading up to the 2010 Stock Dividend and provided enough facts for a stockholder to conclude that Morgan, while temporarily in control of the corporate machinery by virtue of the Proxies, had transferred permanent control of First Orion to himself. Specifically, the document disclosed that Fotta and Telemark together owned approximately 87% of the Company when it was formed;

[91] *Id.* at 3026.
[92] *Id.* at 3015.
[93] *Id.* at 3016.

that Morgan later contributed $1,100,000 to the Company in exchange for 1,100,000 shares of Preferred Stock; that Fotta, Morgan, and the Company entered into the 2009 Letter Agreement, through which Morgan obtained the Proxies representing voting control of the Company; that Morgan utilized the Proxies to remove Fotta as an officer and director of the Company; that the Board had recommended a stock dividend that would give preferred stockholders 73.9901 shares of common stock for each outstanding share of Preferred Stock; that the proposed stock dividend would result in a restructuring of the capital and stock ownership of the Company by transferring control to the current holders of preferred stock; and that Morgan and Stalnaker, representing the sole directors of First Orion, had approved the resolution. In addition, the Actions by Consent of the Shareholders of February 27, 2010 and of February 16, 2010, indicated that Morgan, via the Proxies granted by the Fotta Plaintiffs and also as a Preferred Stockholder, had enough voting power to control the Company. Therefore, as of February 19, 2010, the Plaintiffs held sufficient information to pursue an *equitable* claim regarding the 2010 Stock Dividend.

The Plaintiffs stress that the Stalnaker Letter did not provide sufficient information regarding the Company's capital accounts and thus the Plaintiffs were unable to evaluate First Orion's surplus at the time of the 2010 Stock Dividend. This information, however, is pertinent only to their *legal* claims against the Defendants, which claims have not been challenged under the statute of limitations and are not

subject to the equitable defense of laches.[94]

>  b. The Reasonableness of the Plaintiffs' Delay and Resulting Prejudice to the Defendants

Once the claimants are charged with sufficient knowledge of a potential claim, the Court must determine if the claimant's delay was reasonable. The Fotta Plaintiffs filed the Original Complaint on January 17, 2013, nearly three years after the Stalnaker Letter. Over five months later, on May 23, 2013, the Plaintiffs filed their Amended Complaint, which for the first time included the Individual Plaintiffs. To determine the bounds of unreasonable delay, the Court typically refers to the statute of limitation by analogy.[95] However, Courts in equity are not confined by the statute of limitation; where unusual conditions or extraordinary circumstances are present, the Court may assess unreasonable delay as equity requires.[96] In sum, the "length of delay is less important than the reasons for it."[97]

The Defendants argue that the Plaintiffs have failed to articulate a reasonable justification for their delay, pointing mostly to deposition testimony taken as part of this litigation. For example, when asked why he waited until 2013 to bring this action, Fotta averred that he was busy working for another company and that he did

---

[94] Laches in that context could have an effect on any equitable remedy for disregard of the statutes, however.

[95] *See Bean v. Fursa Capital Partners, LP*, 2013 WL 755792, at *4 (Del. Ch. Feb. 28, 2013).

[96] *See IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177–78 (Del. 2011) (citing *Wright v. Scotton*, 21 A. 69, 73 (Del. 1923)).

[97] *Id.* at 177 (citing *Whittington*, 991 A.2d at 8).

not have the necessary financial resources to engage legal representation.[98] Similarly, the Individual Plaintiffs were each asked why they failed to file suit shortly after receiving the Stalnaker Letter, and each averred that either they did not truly understand that they had a potential claim or that the size of their investment in First Orion could not justify the expense of a suit.[99] It is the Defendants not-inconceivable theory that in 2010, the Plaintiffs were content to see Morgan take the reins of a failing, near worthless First Orion, an attitude that only changed years later, after Morgan's effort and investment had made the Company valuable.

The Plaintiffs failed to deny or further explain their reasons for delay in their briefing. Instead, the Plaintiffs argue that their claims were filed within the analogous statute of limitation. The parties agree that the analogous statute of limitation for a claim of breach of duty is three years; the Plaintiffs, however, contend that their "illegal dividend claims" are subject to the analogous six-year statute of limitation set out in Section 174.[100] To the extent the Plaintiffs refer to their claims based on violations of Sections 170 and 173 of the DGCL, I need not determine the analogous statute of limitation because those claims are legal in nature and uncontested by the Defendants in their laches defense. Otherwise, to the extent

---

[98] Defs' Opening Br., Ex. 17, at 224:18–225:12.

[99] *See id.*, Ex. 12, at 60–61; *id.*, Ex. 13, at 28, 43–44; *id.*, Ex. 14, at 30–31; *id.*, Ex. 15, at 38, 55.

[100] Section 174 states, in part: "In case of any willful or negligent violation of § 160 or § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend." 8 *Del. C.* § 174(a).

the Plaintiffs intend to use the statutory violations as support for their breach of duty claims, the appropriate analog is the three-year statute of limitation.

The Court's application of laches is not a rigid test under which I must evaluate the Plaintiffs' delay in isolation. Instead, like most equitable doctrines, laches requires a balancing, where the claimant's delay, and the reasons for it, are balanced against the resulting prejudice to the defendant under the specific factual circumstances in each case.[101] Here, the Plaintiffs have failed to assert a sufficient reason why they waited until the analogous statute of limitation had nearly run—or had already run, in the case of the Individual Plaintiffs case. I therefore turn to resulting prejudice.

The final inquiry in a laches analysis is whether the Defendants suffered prejudice as the result of the Plaintiffs' unreasonable delay. The Defendants argue that they and third-party investors would be prejudiced by the Plaintiffs' delay if relief is granted. The Defendants assert that, since the Stalnaker Letter of February 19, 2010, the Defendants have raised additional capital from new investors who would not have invested if the Defendants had not controlled the Company.

---

[101] *See Quill v. Malizia*, 2005 WL 578975, at *14 (Del. Ch. Mar. 4, 2005) ("Incorporating the concept of 'unreasonable' delay, laches seeks to equitably balance the factual circumstances of each case.") (citing *Fed. United Corp. v. Havender*, 11 A.2d 331, 343 (Del.1940) ("What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. No rigid rule has ever been laid down.")); *see also Houseman v. Sagerman*, 2015 WL 7307323, at *5 (Del. Ch. Nov. 19, 2015) ("[L]aches entails a balancing: has a plaintiff's dilatory approach to litigation disadvantaged the defendant so that equity should deny the plaintiff the right to a decision on the merits?").

Furthermore, in reliance on that additional capital, the Defendants contend that they transformed First Orion from a marginal business to a successful enterprise. To illustrate the increase in value, the Defendants point to the implied valuations resulting from equity raised after the 2010 Stock Dividend. According to the Defendants, shortly after the 2010 Stock Dividend, the Company raised capital based on a valuation of $3 million. Conversely, over two years later, the Company initiated an offering that valued the Company at more than $26 million. The Defendants argue that, had the Plaintiffs sought relief sooner, the Defendants would not have continued to control First Orion and would, therefore, lack sufficient incentive to oversee its success. Moreover, the Defendants argue that third-party investors would not have supplied the capital necessary to drive First Orion's growth had Defendants not controlled the Company. In sum, the Defendants argue that the Plaintiffs' "wait and see" approach has prejudiced the Defendants because as the value of First Orion increased over time, the amount of rescission damages that the Plaintiffs now seek have also increased.

The Plaintiffs argue that cancellation of the common stock issued in the 2010 Stock Dividend, or rescission damages that emulate a cancellation, will not harm third parties because their stock ownership can be weighted retroactively to maintain the same percentage ownership of the Company. To the extent the Defendants suffer financial loss as the result of the cancellation of the 2010 Stock Dividend, the

Plaintiffs argue, that loss is the sole result of their breaches of fiduciary duty.

Given the facts and circumstances in this case, it is clear to me that the Plaintiffs were aware of the facts necessary to bring an equitable claim in February 2010 and that as the result of their delay, the Defendants and third parties have suffered some quantum of prejudice. What is unclear to me, however, is the extent to which those parties suffered prejudice; the extent to which equity requires me to disregard such prejudice as resulting from those parties' breaches of duty; and to what extent the Plaintiffs should have known that their active delay was causing the Defendants that resulting prejudice. These questions of fact are also interwoven with the remedy, if any, that will ultimately be crafted in this case. Therefore, the second and third inquiries required in consideration of laches can only be determined on a more developed record. The Defendants' Motion for Summary Judgment for laches is, accordingly, denied.

### 3. The Claims Challenging the Stalnaker Options

The Defendants argue that the Plaintiffs' claims regarding the Stalnaker Options should be dismissed because the Plaintiffs failed to make a demand on the Company's Board and have not sufficiently pled that its failure is excused. In their Second Amended Complaint, filed December 9, 2014, the Plaintiffs, for the first time, challenged the grant of the Stalnaker Options. In their derivate claim against Morgan and Stalnaker in Count I, the Plaintiffs added in the Second Amended

34

Complaint that "[t]he grant of the Stalnaker Options was a self-dealing, bad faith transaction which benefited Stalnaker personally and amounted to a gift or waste of corporate assets."[102] The Plaintiffs also added Count VII, a derivative claim against Stalnaker for "Declaratory Judgment that the Second Stalnaker Options are Void *Ab Initio*."

Generally, when claims are already properly before the Court, Rule 23.1 does not require a plaintiff to reevaluate compliance with the rule merely because the composition of the board has changed before the filing of an amended complaint.[103] Such a rule avoids an undue pleading burden and inefficient inquiry, and allows litigation to proceed in an orderly fashion. However, where the composition of a board changes after the complaint is filed, and then a plaintiff amends her complaint to challenge a transaction that is not "already in litigation," the plaintiff may be required to excuse (or make) a demand on the board as then constituted regarding the new claim.[104] In other words, an amendment to assert a claim based on a new and distinct cause of action derivatively—made after the board composition has changed—implicates the same interests as any derivative claim, and is subject to compliance with Rule 23.1. Therefore, where a plaintiff amends to add a new

---

[102] Compl. ¶ 109.

[103] *Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. May 4, 1990) ("When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one.").

[104] *See id.* (citing *Kaufman v. Beal*, 1983 WL 20295 (Del. Ch. Feb. 25, 1983)).

derivative claim after a change in the composition of the board, in order to avoid renewed review under Rule 23.1, the plaintiff must show that:

> [F]irst, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint.[105]

The Defendants concede that the Original Complaint was well pleaded as a derivative action and that demand was excused at the time of the Original Complaint, when the Board was composed of Morgan and Stalnaker. However, the Defendants argue that the Stalnaker Options represent a distinct transaction that was not challenged in the Original Complaint. I examine the claims relating to the Stalnaker Options in light of the following rubric: In order to constitute a new claim such that a plaintiff is charged with again establishing demand futility, the amended complaint must not merely "elaborate upon facts relating to acts or transactions" alleged in the initial complaint, nor simply "assert new legal theories of recovery based upon the acts or transactions that formed the substance of the original pleading;"[106] instead, it will only trigger review under Rule 23.1 where it is based on an independent cause of action.

In this case, the Original and First Amended Complaints alleged facts and

---

[105] *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) (citing *Uni-Marts, Inc. v. Stein*, 1996 WL 466961, at *12 (Del. Ch. Aug. 12, 1996)).
[106] *Harris*, 582 A.2d at 231.

claims surrounding the 2010 Stock Dividend, which occurred in February 2010. The Stalnaker Options, however, were issued almost two year later, in late 2011. In order to complete the Stalnaker Options transaction, the Board approved the 2011 Stock Options Plan and Morgan, acting as majority stockholder, approved the stock option issuances that, together, form the Stalnaker Options. I find that the 2010 Stock Dividend and the Stalnaker Options are two discrete transactions. The 2010 Stock Dividend involved Morgan's cementing control of the Company; the Stalnaker Options rewarded a corporate executive with stock in 2011. While either, or both, may be wrongful, they are distinct temporally, factually, and in motivation. The mere fact that the 2010 Stock Dividend possibly enabled Morgan and Stalnaker to issue the Stalnaker Options does not merge the two as one "act or transaction." Therefore, at the time of the Second Amended Complaint, the Plaintiffs were required to plead the additional claims challenging the Stalnaker Options in compliance with Rule 23.1.

According to the Defendants, at the time of the Second Amended Complaint, the Board was composed of Morgan, Womble, and Burnett—Stalnaker was allegedly removed from the Board in July 2013. The Plaintiffs' Second Amended Complaint, mirroring the two complaints filed before it, alleges only that a demand would be futile because First Orion's Board consisted of Morgan and Stalnaker. The Second Amended Complaint thus fails to mention that the composition of the Board

37

had changed, and fails to assert why Womble and Burnett could not apply business judgment in consideration of any demand relating to the Stalnaker Options; it, therefore, fails to properly plead that demand is futile in accordance with Rule 23.1.[107]

I note that the Plaintiffs have not disputed that the Board composition has changed, or that the two new directors were capable of considering a demand that Morgan and Stalnaker be sued for breaches of duty. Instead, the Plaintiffs point to this Court's holdings in *Seinfeld v. Slager*,[108] which, according to the Plaintiffs, states that demand is excused if a claimant properly pleads a waste claim. The Plaintiffs misunderstand *Seinfeld*. In *Seinfeld*, the plaintiff, without making a demand on the board, filed a derivative suit that challenged multiple compensation decisions by the board and asserted that many of the challenged decisions constitute

---

[107] The parties have not reached the issue of whether I should employ either the *Aronson* or *Rales* test to determine whether the Plaintiffs' demand is futile. I need not make that determination here. The Court has recognized that "the *Rales* test functionally covers the same ground as the *Aronson* test in determining the impartiality of directors" for the purpose of assessing demand futility. *Sandys v. Pincus*, WL 2016 —, (Del. Ch. Feb. 29, 2016) (citations omitted). The Plaintiffs have made no attempt to argue that Womble and Burnett were beholden to someone interested in the issuance of the Stalnaker Options such that they would be unable to consider the demand impartially. *See Sandys v. Pincus*, WL 2016 —, (Del. Ch. Feb. 29, 2016) (citing *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2014)). Furthermore, even if I assume that, for the purpose of the Defendants' motion, Morgan was a controller at the time of the Second Amended Complaint, the presence of a controller is not itself sufficient to overcome the directors' presumption of independence. *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 66 (Del. Ch. 2015) (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000)).
[108] 2012 WL 2501105 (Del. Ch. June 29, 2012).

corporate waste.[109]  The plaintiff, implicating the second prong of the well-known *Aronson* test, argued that demand was excused because the challenged transactions were not the product of business judgment.  Under *Aronson*, to show that demand is futile under Rule 23.1, the plaintiff must allege particularized facts that raise a reason to doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[110]  At the time of the complaint, the board in *Seinfeld* was the same as that against whom waste was pled.  In assessing the plaintiff's compliance with Aronson's second prong, the Court stated that, "[d]emand may be excused under the second prong of Aronson if a plaintiff properly pleads a waste claim."[111]  The Court then described the stringent requirements of pleading a waste claim.

*Seinfeld*, unremarkably, held that a particularized pleading of waste committed by the board on whom demand would otherwise be made may excuse demand under *Aronson*, but that circumstance is absent here:  the Second Amended Complaint does not allege that waste was committed by *Womble or Burnett*, who constituted the majority of the Board when the claim based on the Stalnaker Options was filed.

---

[109] *Id.* at *1.

[110] *Id.* at *2 (citing *Brehm*, 746 A.2d at 253 (Del. 2000) (quoting *Aronson*, 473 A.2d at 814 (Del. 1984))).

[111] *Id.* at *3 (citing *Orloff v. Shulman*, 2005 WL 3272355, at *11 (Del. Ch. Nov. 23, 2005)).

Since the Plaintiffs have failed to plead particularized facts excusing demand on the Board as constituted at the time of their Second Amended Complaint, I find that they have not complied with Rule 23.1. Therefore, the Plaintiffs' claims challenging the Stalnaker Options are dismissed.[112]

## IV. CONCLUSION

Based on the reasons stated above, the Plaintiffs' Motion for Summary Judgment is denied. Likewise, the Defendants' Motion to Dismiss and/or for Summary Judgment is denied, with the exception that the claims challenging the Stalnaker Options in Counts I and VII are dismissed. To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

---

[112] Because of this determination, I do not address the Defendants' argument that summary judgment is appropriate because the Stalnaker Options were ratified by a disinterested majority of the Board.